*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

DEONTON AUTEZ ROGERS,

        Defendant-Appellee.

FOR PUBLICATION
August 5, 2021

No. 346348
Wayne County Circuit Court
LC No. 18-006351-01-FH

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

SERVITTO, J. (*concurring*).

I agree with the result reached by the majority. I write separately, however, to address several issues I believe require attention.

First, I completely agree with the majority that the trial court erred in relying upon the Penal Code, at MCL 750.10, to define the word "gender" given the purpose of MCL 750.10. I additionally note that in relying on that provision, the trial court found it persuasive that there were two bills pending before the Legislature that would add the terms "gender identification" and "sexual orientation" to MCL 750.147b: 2017 HB 4800 and 2017 SB 0121. However, the Legislature does not necessarily intend to *change* the meaning of a statute merely by amending the statute's language; an amendment could merely reflect the Legislature's desire to clarify its intent. See *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009) ("[A] change in statutory language is presumed to reflect *either* a legislative change in the meaning of the statute itself *or* a desire to clarify the correct interpretation of the original statute." (emphasis added)). In addition, construing an unambiguous statute by relying on legislative history or potential amendment allows a reader, with equal plausibility, to pose a conclusion of his own that differs from that of the majority. *People v Gardner*, 482 Mich 41, 57; 753 NW2d 78 (2008). Finally, in *Bostock v Clayton Co, Georgia*, __ US __; 140 S Ct 1731, 1747; 207 L Ed 2d 218 (2020), the Supreme Court specifically rejected postenactment legislative history as a basis for interpreting a statute. "[S]peculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier

Congress did adopt." Thus, the trial court's additionally stated reason for finding that the ethnic intimidation statute did not apply to transgender people is without basis.

Next, I disagree with the majority's reliance upon a 1988 dictionary definition of "gender" in its analysis. Because the ethnic intimidation statute, MCL 750.147b, was enacted in 1988 and contains no definition of the term "gender", the majority relies upon a dictionary definition of "gender" from that year. According to the majority, MCL 750.147b was not enacted in an era of a contemporary understanding of that term. Rather, the majority posits, the definition of "gender" was understood in 1988 to be synonymous with "sex," which, in turn, referenced only the biological roles of male and female.

While I do not disagree that dictionaries may sometimes be used as an aid in interpreting statutory terms, "recourse to the dictionary is unnecessary when the legislative intent may be readily discerned from reading the statute itself." *ADVO-Sys, Inc v Dept of Treasury*, 186 Mich App 419, 424; 465 NW2d 349 (1990). Moreover, "[a] statute is not ambiguous merely because a term it contains is undefined." *Diallo v LaRochelle*, 310 Mich App 411, 417–18; 871 NW2d 724 (2015). Here, I do not believe that reference to a dictionary is necessary to discern the legislative intent in MCL 750.147b.2,[1] because there is nothing textually ambiguous about the use of the word "gender" in the ethnic intimidation statute, when common sense is applied.

MCL 750.147b. provides, in pertinent part:

(1) A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following . . .

While there is no binding authority stating the exact purpose of the ethnic intimidation statute, it can be gleaned from the language of the statute itself that it is intended to criminalize harassing and intimidating behavior when the behavior is based on a victim's specific characteristics. Our role is to effectuate the intent of the Legislature, as determined from the statutory language. *Bukowski v City of Detroit*, 478 Mich 268, 273; 732 NW2d 75 (2007). In MCL 750.147b, the Legislature sought to redress crimes motivated by a person's intolerance of another's specifically listed characteristics (race, color, religion, gender, or national origin) and the victim's gender was clearly not tolerated by defendant and, in fact, prompted his behavior.

I also do not believe that *Barbour v Dep't of Social Services*, 198 Mich App 183; 497 NW2d 296 (1993), supports the majority's position that "gender" was commonly understood as synonymous with "sex" at the time MCL 750.147b was drafted. In that case, the plaintiff was

---

[1]Notably, however, that the 1971 edition of The Random House Dictionary of the English Language, in defining "gender" states, "[t]he number of different genders in different languages varies from two to more than twenty; often the classification correlates, *in part*, with sex or animateness" (emphasis added). When the Legislature does not designate a particular dictionary that it referenced in crafting a particular statute, I do not see how it can be said that any one dictionary is the best, let alone conclusive, determiner of legislative intent.

subjected to harassment in efforts to get him to "engage in homosexual sex." *Id*. at 184. This Court thus stated that the "[p]laintiff's sexual orientation constituted the subject matter of the harassment." *Id*. Sexual orientation is not the same as gender,[2] and there is no indication that the intimidation and harassment of the victim in this case was based on her sexual orientation, as opposed to her gender.

Finally, I would find *Bostock* more persuasive than the majority appears to have found and, more importantly, consistent with the result that a plain reading of the statute at issue would dictate. *Bostock* concerned three different cases. Most relevant to this matter, Aimee Stephens was first hired by her employer at a time when she presented as male, which was her assigned sex at birth. *Id*. at 1738. But a few years later, after being diagnosed with gender dysphoria, clinicians recommended that she begin living as a woman. *Id*. Years later, Stephens informed her employer that, when she returned from an upcoming vacation, she planned to live and work full-time as a woman. *Id*. Stephens was fired before she left for her vacation. *Id*. She thereafter brought suit under Title VII, alleging discrimination on the basis of sex. The Sixth Circuit Court of Appeals held that Title VII prohibited employers from firing an employee because he or she is transgender. *Id*. The Supreme Court granted certiorari "to resolve at last the disagreement among the courts of appeals over the scope of Title VII's protections for homosexual and transgender persons." *Id*.

The *Bostock* Court determined "[t]he statute's message . . . is equally simple and momentous: An individual's homosexuality or transgender status is not relevant to employment decisions." *Id*. "That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id*. The *Bostock* Court specifically acknowledged that "homosexuality and transgender status are distinct concepts from sex." But, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id*. at 1746-1747. As the Bostock Court noted:

> . . . an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in *both* cases the employer fires an individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it. [*Id*. at 1741.]

"As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them." *Id*. at 1747. In sum, "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that should be the end of the analysis." *Id*. at 1743 (quotation marks and citation omitted).

A plain reading of MCL 750.147b would similarly dictate that, whenever a victim's gender was the impetus for the intimidating or harassing behavior, the conduct falls within the ethnic

---

[2] "Sexual orientation" generally refers to one's preference in sexual partners. See, e.g., Random House Webster's Collegiate Dictionary (1995).

intimidation statute and that should be the end of the analysis. Clearly, under MCL 750147b, if the victim was a man who was harassed or intimidated in whole or in part because he was a man, the conduct would be criminal under the statute. The same would hold true for a woman who was harassed or intimidated in whole or in part because she was woman. There is no plausible reason to determine that the ethnic intimidation statute applies to biologically assigned males who present an outward appearance of male and biologically assigned females who present an outward appearance as female but not to persons whose biologically assigned sex may be different from the sex that their outward appearances reflect. Harassment based on gender is equally at the root of all the scenarios and is the prompting for the harassing or intimidating behavior.

No matter how we define "gender," our role is to effectuate the intent of the Legislature. Applying the term "gender" in any sense, whether it is interpreted as equating with "sex" as the trial court did and the majority does, or given a broader meaning, defendant engaged in harassment and intimidation of the victim based on her gender. The victim was targeted specifically *because* she was assigned biologically male at birth but self-identified and outwardly presented as a different gender. The preliminary examination testimony indicates that defendant's harassment of the victim occurred because her manner of dress did not match defendant's expectations of how a man should appear or behave. As I stated in my prior dissent, and in accordance with *Bostock*, discrimination based upon gender *necessarily includes* discrimination based upon sex as well. Just as an employer who discriminates against an employee for being transgender necessarily discriminates against individual men and women in part because of sex (*Bostock*, 140 S Ct at 1743), where a defendant engages in harassing and intimidating behavior against a transgender person, he necessarily does so on that individual's biologically assigned sex and thus, *in part*, on his or her gender.

As enacted, MCL 750.147b prohibits intimidation and harassment because of gender, "however [it] may manifest [itself] or whatever other labels might attach to [it]." *Bostock*, 140 S Ct at 1747. A plain reading of the statute requires a finding that whenever a victim's gender was the impetus for the intimidating or harassing behavior, the conduct falls within the ethnic intimidation statute. I believe that to recognize that the victim here was targeted because of her gender, however it manifested itself, has an important role in *effectuating the Legislature's intent* in enacting MCL 750.147b — to criminalize and punish hate-based or discriminatory intimidation and harassment.

/s/ Deborah A. Servitto

-4-